# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS,
### NORTHERN DIVISION

JOHN DOES 9-16,

                    Plaintiffs,

v.

EMMETT A. PRESLEY; TED E. SUHL,
individually and d/b/a MAXUS, INC. d/b/a
ARKANSAS COUNSELING ASSOCIATES
INCORPORATED d/b/a TRINITY
BEHAVIORAL HEALTHCARE SYSTEMS,
INC. d/b/a THE LORD'S RANCH; MAXUS,
INC., individually and d/b/a THE LORD's
RANCH; TRINITY BEHAVIORAL HEALTH
CARE SYSTEM, INCORPORATED, individually
and d/b/a THE LORD'S RANCH; THE LORD'S
RANCH CHRISTIAN BOY'S HOME, INC.; THE
LORD'S RANCH CHRISTIAN CENTER AND
CHILDREN'S REHABILITATION UNIT; THE
LORD'S RANCH  PSYCHIATRIC UNIT, INC.;
CHRISTIAN INTERNATIONAL MEDICAL
SCIENCES FOUNDATION, INC.;
CORNERSTONE TREATMENT CENTER, INC.;
BURKLYN CORPORATION; GOOD
SAMARITAN REHABILITATION CENTER,
INC.; WARM SPRINGS CHRISTIAN
CENTER, INC.; TRINITY DYNAMICS,
INCORPORATED; THE LORD'S RANCH
BEHAVIORAL HEALTHCARE SYSTEM,
INCORPORATED; TRIENNIA HEALTH CARE,
INC.; HORIZON SUNRISE MANAGEMENT;
MILLENIA HEALTH CARE, INC.; LG
PROPERTY MANAGEMENT,
INCORPORATED; GREEN VALLEY ASSET
MANAGEMENT, LLC; ROLLING HILLS
INVESTMENTS, LLC; REGAL PROPERTY
DEVELOPMENT LLC; SHIRLEY SUHL;
ALONZA JILES; and JOHN DOE
DEFENDANTS 1–10.

                    Defendants.

Case No.: 3:24-cv-00003-DPM

Plaintiffs demand a jury trial

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JAN 0 9 2024

TAMMY H. DOWNS, CLERK
By:_____
                              DEP CLERK

This case assigned to District Judge Marshall
and to Magistrate Judge Volpe

1

## COMPLAINT

NOW COME Plaintiffs JOHN DOE 9, JOHN DOE 10, JOHN DOE 11, JOHN DOE 12, JOHN DOE 13, JOHN DOE 14, JOHN DOE 15, and JOHN DOE 16, by and through their attorneys, Martin D. Gould of ROMANUCCI & BLANDIN, LLC, and Joshua D. Gillispie of GILLISPIE LAW FIRM, and for their Complaint against Defendants EMMETT A. PRESLEY; TED E. SUHL, individually and d/b/a MAXUS, INC. d/b/a ARKANSAS COUNSELING ASSOCIATES INCORPORATED d/b/a TRINITY BEHAVIORAL HEALTHCARE SYSTEMS, INC. d/b/a THE LORD'S RANCH; MAXUS, INC., individually and d/b/a THE LORD's RANCH; TRINITY BEHAVIORAL HEALTH CARE SYSTEM, INCORPORATED, individually and d/b/a THE LORD'S RANCH; THE LORD'S RANCH CHRISTIAN BOY'S HOME, INC.; THE LORD'S RANCH CHRISTIAN CENTER AND CHILDREN'S REHABILITATION UNIT; THE LORD'S RANCH  PSYCHIATRIC UNIT, INC.; CHRISTIAN INTERNATIONAL MEDICAL SCIENCES FOUNDATION, INC.; CORNERSTONE TREATMENT CENTER, INC.; BURKLYN CORPORATION; GOOD SAMARITAN REHABILITATION CENTER, INC.; WARM SPRINGS CHRISTIAN CENTER, INC.; TRINITY DYNAMICS, INCORPORATED; THE LORD'S RANCH BEHAVIORAL HEALTHCARE SYSTEM, INCORPORATED; TRIENNIA HEALTH CARE, INC.; HORIZON SUNRISE MANAGEMENT; MILLENIA HEALTH CARE, INC.; LG PROPERTY MANAGEMENT, INCORPORATED; GREEN VALLEY ASSET MANAGEMENT, LLC; ROLLING HILLS INVESTMENTS, LLC; REGAL PROPERTY DEVELOPMENT LLC; SHIRLEY SUHL; ALONZA JILES; and JOHN DOE DEFENDANTS 1-10, hereby state as follows:

## **INTRODUCTION**

1.      From its founding in 1976 until its closing in 2016, The Lord's Ranch ("Lord's Ranch") was a place where children ranging from 10 to 17 years of age were regularly abused physically, psychologically, and sexually.  Men and women who owned, operated, and staffed the facility preyed on and abused the children housed on the remote facility in Warm Springs, Arkansas routinely and systematically. The systematic and widespread abuse included premeditated sexual abuse and child rape, often under threat of force; extreme physical violence and abuse resulting in serious injuries such as broken bones; and psychological manipulation and torment, such as isolation closets and straitjackets. The facility and its agents also engaged in concerted efforts to cover-up and conceal allegations of abuse. When victims reported abuse to other staff, the leadership at Lord's Ranch either feigned concern while taking no action and allowing the abuse to continue or threatened the victims with reprisals should they report the abuse further. When victims reported abuse to adults outside of Lord's Ranch, such as their parents, Lord's Ranch actively sought to discredit the child, telling the parents the child was lying and engaging in misconduct at the Ranch. These attempts by children to seek help from outside the Lord's Ranch always resulted in reprisals, often in the form of physical beatings and various forms of psychological and physical torture.  More specifically, Plaintiffs allege that the Defendants, and most notably the Suhl family (Ted Suhl, Bud Suhl, and Shirley Suhl), possessed an overwhelming amount of actual knowledge concerning innumerable incidents of child rape continuously and routinely committed by the facility's Director of Social Services, Emmett Presley, over a period of more than ten years; and that, because of this, it can only fairly be said that the Suhl family condoned the enormous amount of child sexual abuse being committed by Emmett Presley.  Otherwise, they would have reported it, terminated him, or, at the very least,

prohibited Presley from continuing to rape and molest the children under their care. The Suhl

family did none of these things, knowing full well that their failures to act would without a doubt

cause more young boys at the Lord's Ranch to be raped by Emmett Presley.

2.       The subject claims of this Lord's Ranch lawsuit involve horrific child sexual

abuse. The claims stem from child sexual abuse committed by Defendant Emmett A. Presley. It

should be noted, however, that Presley was not the only perpetrator of child sexual abuse at the

Lord's Ranch and that numerous other former residents allege sexual abuse by several other staff

members.

3.       As described further herein, Defendant Emmett A. Presley sexually abused

numerous minor male residents of the Lord's Ranch. Presley's sexual abuse of these young boys

included but was not limited to innumerable incidents of fondling of genitals and oral rape.

4.       At all relevant times, Defendant Presley was a licensed counselor who was one of

the most senior full-time administrators at Lord's Ranch, serving as the Director of Social

Services. He administered counseling to his victims and other minor residents.

5.       The Lord's Ranch leadership, including Bud Suhl, Ted Suhl, Shirley Suhl and

several long-serving staff members, such as deputy administrator Alonza Jiles, were fully aware

that Emmett Presley habitually raped and sexually molested minor male residents of the Lord's

Ranch, particularly Presley's own counseling patients. They were fully aware of this from near

the start of Presley's employment with the Lord's Ranch and prior to the first incident of abuse

Presley committed against the Plaintiffs named herein, and they were fully aware of it

throughout the twenty or more years that Presley was employed at the Lord's Ranch.

6.       The Suhl family, including Defendants Ted Suhl and Shirley Suhl, made an

intentional, fully conscious decision to allow Presley, their Director of Social Services, to rape

and sexually molest male children under their care; they and their underlings like Alonza Jiles never once lifted a finger to help the children or prevent their sexual abuse by Presley. Rather, they did everything in their power, including the use of threats, intimidation, and physical violence, to silence the many children who spoke up and reported Presley to them over the years, thereby ensuring that Presley could continue his horrific abuse unabated, in turn allowing Shirley Suhl, Bud Suhl, and Ted Suhl to continue profiting financially from operating the Lord's Ranch unchecked by the outside influences and prying eyes that would follow should the outside world hear about Presley's crimes or hear about the innumerable other acts of child abuse routinely perpetrated against the child residents.

7.     At all relevant times, Lord's Ranch staff defendants, including but not limited to Defendants Shirley Suhl, Ted Suhl, Emmett Presley, and/or Alonza Jiles, engaged in the transportation of minors for prohibited sexual conduct. They transported, financed in whole or part the transportation of, and/or otherwise caused or facilitated the movement of minors from across the country to Lord's Ranch in part for the purpose of sexual abuse and exploitation.

8.     Plaintiffs now bring this lawsuit under Arkansas state law and federal law seeking compensation for the devastating damages caused by Lord's Ranch's acts and omissions, for negligence, and for punitive damages seeking to deter other facilities from engaging in similarly shocking and reprehensible conduct.

## PARTIES, JURISDICTION, AND VENUE

9.     Plaintiffs hereby incorporates by reference the previous paragraph as if fully set forth herein.

### A. Plaintiffs

5

10.     Plaintiff **John Doe 9** is an adult resident of the District of Columbia. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff was a resident of the Lord's Ranch.

11.     Plaintiff **John Doe 10** is an adult resident of the State of Illinois. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff was a resident of the Lord's Ranch.

12.     Plaintiff **John Doe 11** is an adult resident of the State of Illinois. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff was a resident of the Lord's Ranch.

13.     Plaintiff **John Doe 12** is an adult resident of the State of Wisconsin. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff was a resident of the Lord's Ranch.

14.     Plaintiff **John Doe 13** is an adult resident of the State of Indiana. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff was a resident of the Lord's Ranch.

15.     Plaintiff **John Doe 14** is an adult resident of the State of Illinois. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff was an unemancipated minor

residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff was a resident of the Lord's Ranch.

16.    Plaintiff **John Doe 15** is an adult resident of the State of Illinois. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff was a resident of the Lord's Ranch.

17.    Plaintiff **John Doe 16** is an adult resident of the State of Illinois. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff was a resident of the Lord's Ranch.

### B. Lord's Ranch Defendants

18.    The Lord's Ranch was started in 1976 by Shirley and Bud Suhl when they began counseling children and assisting them in "growing emotionally, spiritually, and behaviorally."

19.    In 1987, The Lord's Ranch was licensed by the Arkansas Department of Human Services as a Residential Childcare Facility.

20.    At all relevant times, The Lord's Ranch served as and held itself out to the public as a residential treatment center for children and adolescents, accepting residents ranging from 6 to 17 years of age.

21.    At all relevant times, The Lord's Ranch was based out of Warm Springs, Arkansas, comprising of over 1,100 acres, with its primary address located at 1033 Old Burr Road, Warm Springs, AR 72478.

7

*Figure 1*

22.    At all relevant times, The Lord's Ranch and its associated entities, predecessor entities, and successor entities, including the entities identified below, all shared the same principal place of business in Warm Springs, Arkansas; all shared the same owners and key managerial employees; and all did business as "The Lord's Ranch," which is how they shall be referred to herein.

23.    In or around 1984, **The Lord's Ranch Christian Boy's Home, Inc.** was incorporated as a non-profit corporation in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, AR 72478. The Lord's Ranch Christian Boy's Home, Inc.'s registered agent was Shirley Suhl, whose registered agent address was at 1033 Old Burr Road, Warm Springs, AR 72478.

24.    Prior to The Lord's Ranch Christian Boy's Home, Inc.'s dissolving, it had identified the following Officers with the Arkansas Secretary of State: Shirley Suhl, Director; Allied West Consulting LLC, Director; Western Sky Managers LLC, Director.

25.    In or around 1990, **Good Samaritan Rehabilitation Center, Inc.** was incorporated as a For Profit corporation in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, AR 72478. Good Samaritan

8

Rehabilitation Center, Inc.'s registered agent was Ted Suhl, whose registered agent address was 1033 Old Burr Road, Warm Springs, AR 72478. Good Samaritan Rehabilitation Center, Inc.'s charter has since been forfeited.

26.     In or around 1994, **Christian International Medical Sciences Foundation, Inc.** was incorporated as a non-profit corporation in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, AR 72478. Christian International Medical Sciences Foundation, Inc.'s registered agent was Ted Suhl, whose registered agent address was 1033 Old Burr Road, Warm Springs, AR 72478. Christian International Medical Sciences Foundation, Inc., has, upon information and belief, since been statutorily dissolved.

27.     In or around 1995, **The Lord's Ranch Christian Center and Children's Rehabilitation Unit** was incorporated as a non-profit corporation in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, AR 72478. The Lord's Ranch Christian Center and Children's Rehabilitation Unit's registered agent was Bud Suhl, whose registered agent address was 1033 Old Burr Road, Warm Springs, AR 72478. The Lord's Ranch Christian Center and Children's Rehabilitation Unit was eventually statutorily dissolved, upon information and belief.

28.     In or around 1995, **Defendant Warm Springs Christian Center, Inc.** was incorporated and still is incorporated as a For Profit Corporation in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, AR 72478. Defendant Warm Springs Christian Center, Inc.'s registered agent is Joel P. Landreneau, whose registered agent address was 1033 Old Burr Road, Warm Springs, AR 72478. At all relevant times until present, Defendant Warm Springs Christian Center, Inc. identifies the following Officers with the Arkansas Secretary of State: Ted E. Suhl, President.

29.     In or around 1999, and at all relevant times, **Defendant Maxus, Inc.**, individually and doing business at times as **Arkansas Counseling Associates**, was incorporated as a For Profit Corporation in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, AR 72478. At all relevant times until present, Defendant Maxus, Inc.'s President was and is Ted. E. Suhl.

30.     At all relevant times, Defendant Maxus, Inc. was a licensed provider of mental health counseling to juvenile patients within the state of Arkansas, including in-patient and outpatient clinics.

31.     Defendant Maxus, Inc. operated 18 outpatient counseling clinics throughout Arkansas and during the relevant time period, was a provider of Medicaid services.

32.     Defendant Maxus, Inc.'s current principal place of business is, upon information and belief, Little Rock, Arkansas. Defendant Maxus, Inc. may be served with process in this action by delivering summons and a copy of this Complaint to its registered agent, C T Corporation System, located at 124 West Capitol Avenue, Suite 1900, Little Rock, Arkansas 72201.

33.     In or around 2001, **The Lord's Ranch Psychiatric Unit, Inc.** was incorporated as a For Profit Corporation in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, AR 72478. The Lord's Ranch Psychiatric Unit, Inc.'s registered agent was Ted E. Suhl, whose registered agent address was 1033 Old Burr Road, Warm Springs, AR 72478.

34.     The Lord's Ranch Psychiatric Unit, Inc. has since, upon information and belief, forfeited its charter and is no longer an active corporation. Prior to The Lord's Ranch Psychiatric

Unit, Inc.'s charter being forfeited, it had identified the following Officers with the Arkansas Secretary of State: Shirley Suhl, Secretary; Shirley Suhl, Treasurer; and Ted E. Suhl, President.

35.     In or around 2005, **Trinity Behavioral Health Care System, Incorporated** was incorporated as a For Profit corporation in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, AR 72478. Trinity Behavioral Health Care System, Incorporated's registered agent was Joel P. Landreneau, whose registered agent address was at 1033 Old Burr Road, Warm Springs, AR 72478.

36.     Prior to Trinity Behavioral Health Care System, Incorporated dissolving, it had identified the following Officers with the Arkansas Secretary of State: Ted E. Suhl, Incorporator/Organizer and President; Shirley A. Suhl, Secretary; and Shirley A. Suhl, Treasurer.

37.     At all relevant times, Trinity Behavioral Health Care System, Incorporated was a licensed Psychiatric Residential Treatment facility that regularly treated approximately 100 inpatient juvenile psychiatric patients ranging in age from 6 to 17. Trinity was licensed by the Arkansas Department of Human Services and was a qualified provider of Medicaid services.

38.     In or around 2006, **Cornerstone Treatment Center, Inc.** was incorporated as a For Profit corporation in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, AR 72478. Cornerstone Treatment Center, Inc. registered agent was Joel P. Landreneau, whose registered agent address was 1033 Old Burr Road, Warm Springs, AR 72478. Cornerstone Treatment Center, Inc.'s charter was eventually forfeited.

39.     Prior to its charter being forfeited, Cornerstone Treatment Center, Inc. had identified the following Officer with the Arkansas Secretary of State: Joel P. Landreneau, Incorporator/Organizer.

40.     In or around 2007, **Defendant Trinity Dynamics, Incorporated** was incorporated and still is incorporated as a For Profit Business in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, AR 72478. Defendant Trinity Dynamics, Incorporated's registered agent is Joel P. Landreneau, whose registered agent address was 1033 Old Burr Road, Warm Springs, AR 72478.

41.     Defendant Trinity Dynamics, Incorporated identifies the following Officers with the Arkansas Secretary of State: Ted E. Suhl, President.

42.     In or around 2007, **LG Property Management, Incorporated** was incorporated as a For Profit corporation in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, AR 72478. LG Property Management, Incorporated's registered agent was Joel P. Landreneau, whose registered agent address was 1033 Old Burr Road, Warm Springs, AR 72478. LG Property Management, Incorporated was eventually dissolved.

43.     In or around 2007, **Defendant Green Valley Asset Management, LLC** was incorporated and still is incorporated as an LLC in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, AR 72478. Green Valley Asset Management, LLC registered agent was Joel P. Landreneau, whose registered agent address was 1033 Old Burr Road, Warm Springs, AR 72478. Green Valley Asset Management, LLC identified the following Officer with the Arkansas Secretary of State: Joel P. Landreneau, Incorporator/Organizer.

44.     In or around 2007, **Rolling Hills Investments, LLC** was incorporated and still is incorporated as an LLC in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, AR 72478. Rolling Hills Investments, LLC's registered

agent is Joel P. Landreneau, whose registered agent address was 1033 Old Burr Road, Warm Springs, AR 72478. Rolling Hills Investments, LLC identified the following Officer with the Arkansas Secretary of State: Joel P. Landreneau, Incorporator/Organizer.

45.     At all relevant times, The Lord's Ranch and all its associated entities, predecessor companies, and successor companies were owned and operated by the Suhl family, including but not limited to Defendants Maxus, Inc.; The Lord's Ranch Christian Boy's Home, Inc.; Good Samaritan Rehabilitation Center, Inc.; Christian International Medical Sciences Foundation, Inc.; The Lord's Ranch Christian Center and Children's Rehabilitation Unit; Warm Springs Christian Center, Inc.; The Lord's Ranch Psychiatric Unit, Inc.; Christian International Medical Sciences Foundation, Inc.; Warm Springs Christian Center, Inc.; Trinity Behavioral Health Care System, Incorporated; Cornerstone Treatment Center, Inc.; Trinity Dynamics, Incorporated; LG Property Management, Incorporated; Green Valley Asset Management, LLC; and Rolling Hills Investments, LLC (hereinafter referred to as "The Lord's Ranch Entities" or "The Lord's Ranch.").

46.     At all relevant times, The Lord's Ranch Entities did business as "The Lord's Ranch" or as "Trinity Behavioral Health" with its primary place of business located in Warm Springs, AR (hereinafter, "The Lord's Ranch" will refer to The Lord Ranch Entities' primary place of business and surrounding facilities located at and around 1033 Old Burr Road, Warm Springs, AR).

47.     At all relevant times, The Lord's Ranch Entities operated as if they were one single entity.

48.     The Lord's Ranch Entities shared the same website, www.lordsranch.com.

49.     At all relevant times, **Defendant Theodore E. Suhl** ("Ted Suhl") was an owner and senior Director of the Lord's Ranch Entities and facilities including its primary facility located in Warm Springs, AR.

50.     Defendant Ted Suhl previously served as a Deputy Director under his father, Bud Suhl, who served as The Lord's Ranch's Executive Director. Ted Suhl later served as the Lord's Ranch's Executive Director.

51.     Upon information and belief, Defendant Ted Suhl is a resident of Jonesboro, Craighead County, Arkansas.

52.     At all relevant times, **Defendant Shirley Suhl** was a founder, owner, and senior Director of the Lord's Ranch Entities and facilities including its primary facility located in Warm Springs, AR, serving as an Administrative Director, among other senior positions.

53.     Upon information and belief, Defendant Shirley Suhl is a resident of Jonesboro, Craighead County, Arkansas.

54.     At all relevant times, **Defendant Emmett A. Presley,** MSWAC, LCSW, ACSW, QCSW, DCSW, served as a senior Director of the Lord's Ranch Entities and facilities including its primary facility located in Warm Spring, AR, serving as the Director of Social Services at The Lord's Ranch.

55.     At all relevant times, Defendant Presley's responsibilities at the Lord's Ranch included among others providing counseling to residents, coordinating social work services, preparing diagnostic summaries, developing and reviewing service plans, and providing other therapeutic treatment services. Defendant Presley was a full-time administrative staff member at the Lord's Ranch.

14

56.     Upon information and belief, Defendant Presley is a resident of Jonesboro, Craighead County, Arkansas, and he may be served with process at 4208 Sandra Cove, Jonesboro, Arkansas 72405.

57.     At all relevant times, **Defendant Alonza Jiles** served as a senior Director of the Lord's Ranch Entities and facilities including its primary facility located in Warm Spring, AR, serving as the Deputy Administrator at The Lord's Ranch.

58.     Upon information and belief, Defendant Alonza Jiles is a resident of Paragould, Greene County, Arkansas.

59.     Hereinafter, the Lord's Ranch Entities, Ted Suhl, Shirley Suhl, Emmet Presley, and Alonza Jiles will collectively be referred to as **The Lord's Ranch Defendants**.

## JURISDICTION & VENUE

60.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

61.     At all relevant times, Defendants received federal financial assistance within the meaning of 20 U.S.C. § 1681(a) and are subject to Title IX. Moreover, Plaintiffs have brought claims under 18 U.S.C. § 1595(a), the Trafficking Victims Protection Reauthorization Act ("TVPRA").

62.     This Court also has jurisdiction over the causes of action asserted herein and over the parties to this action pursuant to 28 U.S.C. § 1332(a)(1), as there is diversity of citizenship and the amount in controversy exceeds $75,000.00.

63.     This Court has supplemental jurisdiction over Plaintiffs' state law causes of action, including but not limited to claims for negligence, assault, and battery, pursuant to 28

U.S.C. § 1367(a), because they are so related to the federal claims that they form part of the same case or controversy.

64.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## STATUTE OF LIMITATIONS

65.     Plaintiffs' claims are timely under the Justice for Vulnerable Victims of Sexual Abuse Act, codified at Ark. Code Ann. § 16-118-118. Pursuant to this newly enacted law, "a cause of action arising before, on, or after July 28, 2021, that was barred or dismissed due to a statute of limitation, is revived, and the civil action may be commenced not earlier than six (6) months after and not later than thirty (30) months after July 28, 2021."

## FACTUAL ALLEGATIONS

66.     Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

67.     The Lord's Ranch was started in 1976 by Shirley and Bud Suhl when they began counseling children and assisting them in "growing emotionally, spiritually, and behaviorally."

68.     In 1987, The Lord's Ranch was licensed by the Arkansas Department of Human Services as a Residential Child Care Facility.

69.     At all relevant times, The Lord's Ranch served as and held itself out to the public as a residential treatment center and school for children and adolescents, accepting residents ranging from 6 to 17 years of age.

70.     In or around 2006, The Lord's Ranch became Trinity Behavioral Health. However, despite the name change, most people including residents and staff still referred to the facility as "The Lord's Ranch."

16

71.     The Suhl family founded, owned, and ran The Lord's Ranch facilities from 1976-2016 when Ted Suhl was convicted of bribery and The Lord's Ranch's was forced to close.

## A. The Lord's Ranch Defendants used Calculated Corruption and Deception to Game the System for Financial Gain, Mislead the Public, and Cover-Up the Systemic Abuse of Children.

72.     The Lord's Ranch Defendants, led by Ted Suhl and Shirley Suhl, were able to game the system for personal and financial gain through years of corruption, bribery, calculated political donations, legislative lobbying, and invoking religious doctrine and cause where it suited them.

73.     Ted Suhl was appointed to the Arkansas Child Welfare Agency Review Board in 2000 and reappointed in 2004. The Arkansas Child Welfare Agency Review Board was responsible for licensing childcare facilities within the State of Arkansas, including those owned and operated by the Suhl family, enabling Suhl to essentially police himself and his criminal organization.

74.     During this time period, the State of Arkansas created a system that allowed health care providers of residential treatment to hold oversight positions for their own industry.

75.     From 1996-2007, Ted Suhl also lobbied heavily to keep state Medicaid dollars flowing to his residential care facilities, The Lord's Ranch Entities.

76.     From 2002 through 2008, The Lord's Ranch Entities were paid approximately $95 million by the State of Arkansas in Medicaid funds.

77.     According to a study by an outside consultant hired by the state of Arkansas in 2006 to evaluate the Medicaid program, despite Arkansas spending a disproportionate amount of money on residential care for troubled kids, children in Arkansas were not getting quality mental health care.

78.     In 2007, the Arkansas Child Welfare board, of which Suhl was a member, defeated a proposal by Arkansas state Sen. Sue Madison to make the board independent of the facilities it regulated.

79.     In or around 2007, a study commissioned by the Arkansas state legislature found that the state's policies pertaining to the way Arkansas provided mental health care to its children were out-of-date with current medical opinion, that regulation was fragmented and ineffective, and that "the state was spending an inordinate amount of Medicaid dollars (according to our figures the second highest in the nation) on residential mental health care."

80.     From 2009 through 2014, The Lord's Ranch Entities were paid over $135 million for Medicaid inpatient and outpatient psychiatric services.

81.     Alaska's Department of Health and Social Services behavioral health division sent juveniles to The Lord's Ranch in Warm Springs, AR beginning in or around 2002 when the facility was still called The Lord's Ranch and continued to send juveniles there after the name changed to Trinity Health in 2006 up until October 2014.

82.     The Lord's Ranch built relationships with numerous other states, including Indiana, Illinois, and Texas.

83.     The Lord's Ranch held itself out to the public as a safe place for children to receive professional, therapeutic treatment, education, and moral guidance in a beautiful, tranquil, natural environment. For example, on its website, The Lord's Ranch stated in part:

> Over twenty years later, The Lord's Ranch is still operated under the directorship of Bud Suhl. Lovingly working together with his family and team members, their commitment to that beginning vision continues to make a difference in the life of every child. The Lord's Ranch has grown from one main building to a residential campus network of multiple buildings and homes in the small community of Warm Springs, Arkansas.

The Lord's Ranch is nestled in the beautiful surroundings of the Ozark foothills. Over 1,100 acres of green rolling hills, small shimmering lakes, flowering trees and horse pastures promise tranquility, a restful atmosphere, peace and the beauty of nature. It is this setting that the Suhls' vision of Total Concept Healing (psychological, medical, emotional and spiritual) takes place.

At the Lord's Ranch, we have developed a program unlike other residential resources. Our mission it to provide the best possible treatment in a setting which is as comfortable and homelike as possible. We create a family environment that promotes the development of trust and a feeling of security within the residents. The main 1100 acre spread holds a massive, 5000 square foot main lodge, cottages, school, chapel, vocational building, and lovely lakes, ponds and wildlife habitats. In fact, for many of us, The Lord's Ranch is our home. We are not shift workers who work our shift and go home. We live with the children and are committed to the lives of children. We believe in our mission of helping children grow to be healthy and productive adults, and helping in a way so that they are made to feel part of a family and part of a community. Although we are bigger now than we were in 1976, the Suhl family is dedicated to maintaining the warm friendly feel of a large extended family, nestled comfortably in a quiet, caring community.

One good sign of a happy and healthy family is the ability to laugh and have fun together. Just as in a functional family, laughter, stories of the day's events and relational insights can be heard around the dinner table. Here at the Ranch, we set aside time to have fun. Activities like fishing, field trips, educational trips and trips to amusement parks and ball games are part of our programming. We believe in the use of pet therapy in building confidence and responsibility in youth. And we believe in the celebration of life, through celebration of special times like decorating for Christmas, graduations and birthdays . . .

Any building can be termed a residential treatment center. It takes special people and a higher level of caring to turn that facility into a loving, nurturing environment. And although The Lord's Ranch houses over 70 "family" members, it is, in every sense of the word, a home.

84.     The Lord's Ranch highlighted its therapeutic program to the public and the states

sending children to its facilities, stating in part on its website:

a.  Our program is integrated by our teams of professionals: medical staff, social workers, special education teachers, advisors, administrative staff, consulting staff, and religious staff. Individual and group counseling, based on each child's needs, is provided by a psychologist and a licensed, clinical social worker, who also directs the development of individualized treatment programs. Psychological and psychiatric services are provided on a consultation basis . . . The Lord's Ranch provides a therapeutic treatment plan

tailored to meet the needs of each resident. Group sessions, designed to use the Bible as the main source of reference, are conducted on a daily basis for all residents.

b. The Lord's Ranch provides an intensive therapeutic program, with a therapist to resident ratio of approximately 9:1.

85. At all relevant times, Lord's Ranch Defendants actively misled the public and the states sending children to its facilities regarding the systemic abuse that the children were being subjected to on a regular basis at its facility in Warm Springs, AR, whereby Lord's Ranch Defendants included photos like those below in *Figures 2-4* on its website and brochures highlighting the religious, moral instruction provided and the outdoor activities it claimed to offer.



*Figure 2*



*Figure 3*



*Figure 4*

86.     On the Lord's Ranch webpage discussing its "Therapeutic Program," the

Lord's Ranch Entities wrote in part:

> Finally, and most importantly, The Ranch program emphasizes the need for
> spiritual development. Without the proper spiritual framework and values, the
> best educational and therapeutic programs in the world will fail. The program
> offers exposure to Judeo-Christian values and Judeo-Christian traditions to help
> residents find their own way to spirituality.

87.     At all relevant times, Defendant Ted Suhl was expressly aware children

were being physically, psychologically, and sexually abused at Lord's Ranch, including

being expressly aware that Lord's Ranch's Director of Social Services Emmett Presley

was sexually abusing his patients (children at Lord's Ranch under his care and

supervision).

88.     At all relevant times, Lord's Ranch Entities held out administrators and

staff they knew were sexual predators, such as Defendant Presley, as adults that should be

trusted and as well-qualified to help the children sent to the facility.

89.     For example, despite receiving express reports and complaints throughout

the 1990s from numerous children that Presley was sexually abusing them, including

specifically numerous accounts of oral rape, in 2000, the Lord's Ranch was still holding

Presley out on its website and to the public as one of its most senior administrators that

should be trusted. His bio on the Lord's Ranch website stated in part:

> Emmett A. Presley, MSWAC, LCSW, ACSW, QCSW, DCSW, Director of Social
> Services – Mr. Presley's primary responsibilities are to coordinate social work
> services, prepare diagnostic summaries, develop and review service plans, and
> provide therapeutic treatment services. Mr. Presley is a full-time administrative
> staff member and is on call 24 hours per day.

### B.   Children were Sexually and Physically Abused at Lord's Ranch for Decades.

90.     Numerous Lord's Ranch staff had sexually and physically abused countless minor

residents and in some cases other female staff until 2016 when the facility was forced to close.

91.     In or around the mid- and late-1980s, a Lord's Ranch staff member and social

worker (hereinafter, "Staff Member W") repeatedly sexually abused and raped a female resident

(referred to herein as "Jane Doe 1"), starting when she was approximately 14-15 years old.  The

Lord's Ranch social worker, Staff Member W, was assigned by Ted and Shirley Suhl to be Jane

Doe 1's counselor. He sexually abused and raped Jane Doe 1 on numerous occasions during her

counseling sessions. Staff Member W eventually told Jane Doe 1 he was in love with her and

wanted to marry her after she turned 16 years old and when her term at the Lord's Ranch was

over.

92.     Jane Doe 1 reported the sexual abuse to other staff, stating she did not want to

have sex with the social worker abuser nor did she want to marry him, and asked for help.

Despite being expressly aware of the abuse, senior administrators and staff, including but not

limited to Bud Suhl (Lord's Ranch's Executive Director at the time), Shirley Suhl

(Administrative Director), and Ted Suhl (Deputy Director at the time), failed to stop the ongoing

sexual abuse. Rather, Jane Doe 1 was told that Staff Member W loved her and she would learn to

love him.  Jane Doe 1 was eventually forced to marry Staff Member W at the Lord's Ranch

chapel, without her parents' knowledge, consent, or presence. The wedding was officiated by

one of the Lord's Ranch's Deputy Administrator, Alonza Jiles. Jane Doe 1 ultimately escaped

Lord's Ranch and obtained a divorce; however, she still suffers from the resulting serious

psychological injuries and trauma.

93.     In another of many examples of the horrific abuse residents were subjected to at

The Lord's Ranch, in the early 1990s, a female resident (referred to herein as "Jane Doe 2") was

raped by a male staff member in an empty classroom when she was around 10-13 years of age.

After the rape, Jane Doe 2 began feeling sick, she reported to a female staff member she thought

she was pregnant. The female staff member took Jane Doe 2 to see Dr. Mark Brown, Lord's

Ranch's Director of Medical Services and a relative of Bud Suhl. Jane Doe 2 reported that

somebody had done something to her and she didn't want to and it hurt, and that she thought she

was pregnant. Dr. Brown diagnosed Jane Doe 2 with an STD, wrote her a script for medication,

and Jane Doe 2 was then taken back to the campus where she was placed in isolation for a short

period of time.

94.     Upon information and belief, The Lord's Ranch failed to investigate Jane Doe 2's

abuse and why and how such a young resident was given an STD.  After receiving treatment

from Dr. Brown, Jane Doe 2 was sexually abused again by the same staff member.

95.     Illinois state entities have records of reported abuse at Lord's Ranch going back to

the late 1980s and early 1990s.

96.     In the first five years The Lord's Ranch accepted Illinois children (around 1988-

1993), the Ranch had a contentious relationship with Illinois state officials. In 1989, the Illinois

Department of Children and Family Services (DCFS) attempted to withdraw kids from the

facility for, among other reasons, it had found that there were untrained, convicted felons

working as counselors with children. Moreover, the State of Illinois's education evaluators reported that children were put in the Lawrence County Jail (Walnut Ridge, AR) for discipline.

97. After reassurances from Lord's Ranch Defendants, in or around February 1992, the Illinois state education board gave full approval to the Lord's Ranch's license.

98. In 1992, the Illinois DCFS stopped sending children to The Lord's Ranch, but the Chicago Board of Education, Cook County Public Guardian's Office, and other public-school officials continued to send children there.

99. As of at least 1990, the Arkansas Department of Human Services (DHS) had received reports of child abuse at Lord's Ranch, including but not limited to improper restraints on minors, physical abuse, and other unwarranted punishments for minor infractions.

100. In 1993, the Arkansas DHS made a finding against Lord's Ranch involving an incident where a Lord's Ranch staff member reported to Arkansas child welfare inspectors that a counselor at the facility threw a boy against lockers and hit him in the head. The Arkansas DHS investigated and found the report credible.

101. In 2006, the Arkansas DHS received allegations by an Alaska youth that he had been assaulted at the Ranch and that he'd been taunted as "gay" afterward.

102. In 2006, Arkansas state Rep. Buddy Blair of Fort Smith convened a legislative hearing to look into The Lord's Ranch because, he said, he had received "too many complaints" against it. One of those complaints, Blair told legislators, was that staff at the Lord's Ranch punished children by sitting on them, pulling their arms behind their backs or making them stand against a wall all day. Suhl attended the hearing, saying he would discipline staff if it were proved that the accusations were true.

103.    The facility took patients from Alaska's Department of Health and Social

Services behavioral health division beginning in 2002, when the facility was called The Lord's

Ranch (name changed to Trinity Health in 2006.)

###    C.    2014-2019: Criminal Investigations, Charges, and Convictions.

104.    In or around October 2014, Assistant US Attorney General Leslie R. Caldwell of

the Justice Department's Criminal Division and First Assistant United States Attorney Patrick C.

Harris of the Eastern District of Arkansas made a public announcement that a former deputy

director of the Arkansas Department of Human Services (DHS), Steven B. Jones, pled guilty to

charges of providing official assistance to Ted Suhl in exchange for bribes concerning programs

receiving federal funds.

105.    A sentencing hearing was scheduled for April 2, 2015, before a U.S. District

Judge of the Eastern District of Arkansas.

106.    According to his plea agreement, Steven B. Jones served as deputy director of

Arkansas DHS from approximately April 2007 until July 2013. While serving in that capacity,

Jones solicited and accepted multiple cash payments and other things of value from the owner of

two businesses (Ted Suhl) that provided inpatient and outpatient mental health services to

juveniles. This individual (Ted Suhl) provided the cash payments and other things of value to

Jones through the use of two intermediaries, a local pastor and a former county probation officer

and city councilman.

107.    As part of his plea, Jones admitted that in return for the bribes, he provided

official assistance, including providing internal Arkansas DHS information about the

individual's businesses. Jones further admitted that he and other members of the conspiracy

concealed their dealings by, among other things, holding meetings at restaurants in Memphis,

Tennessee, or rural Arkansas, where they would not be easily recognized; funneling the cash
payments through the pastor's church; providing the bribe payments in cash so that the
transactions would not be easily traceable; and speaking in code during telephone conversations.

108.    The case was investigated by the FBI's Little Rock Field Office, and was
prosecuted by the Criminal Division's Public Integrity Section and Assistant U.S. Attorneys
from the Eastern District of Arkansas.

109.    In or around October 2014, Arkansas Department of Human Services Director
announced Trinity Behavioral Health Care and Maxus Inc., two companies owned by Ted Suhl,
had been suspended from receiving new Medicaid claims earlier that month after a former
Arkansas Human Services Department deputy director pleaded guilty to accepting bribes in
exchange for inside information that benefited the two Suhl companies (Trinity Behavioral
Health and Maxus, Inc., doing business as Arkansas Counseling Associates)

110.    Arkansas's DHS publicly stated at the time: "So the [Trinity and Maxus] clients
can decide whether to leave or not, but the state will not be providing any payments to that
provider, and it's a party we paid about $25 million to last year."

111.    Arkansas DHS assisted its Trinity and Maxus patients in transferring to other
providers. At the time, Trinity was providing inpatient treatment for approximately 90 children.
Maxus, which did business under the name Arkansas Counseling Associates, provided outpatient
care to approximately 2,500 adults and children. Both were providing mental health services at
the Lord's Ranch facility in Warm Springs, AR.

112.    In or around October 2014, Alaska's Department of Health and Social Services
also suspended Ted Suhl's Lord's Ranch Entities based out of Warm Springs, AR (Trinity
Behavioral Health and Maxus, Inc.) from its Medicaid program.

113.    In or around October 2014, Alaska's Department of Health and Social Services sent a clinician to Trinity Behavioral Health to assist in transitioning the 10 Alaskan children living there to other providers (about 90 children were still living at Lord's Ranch at the time).

114.    In November 2014, a federal court in the Eastern District of Arkansas denied Lord's Ranch Defendants' request for an injunction to stop Arkansas from cutting off Medicaid payments to Trinity Behavioral Health and Maxus, Inc.

115.    In or around December 2015, a federal grand jury indicted Ted Suhl for bribing a former deputy director of the Arkansas Department of Human Services. The six-count indictment charged Suhl with conspiracy to commit bribery and honest service fraud, three counts of honest services fraud, one count federal funds bribery, and one count of interstate travel in aid of bribery. The indictment alleged Ted Suhl bribed Steven B. Jones, former deputy director of ADHS, to "perform acts in his official capacity that benefited Suhl and his mental health companies and to provide internal ADHS information to Suhl."

116.    In or around February 2016, Ted Suhl's other accomplice Phillip Carter was sentenced to two years (24 months) in prison after admitting he funneled bribes from Ted Suhl to Steven B. Jones. Carter pleaded guilty to conspiracy to commit federal funds bribery and honest services wire fraud.

117.    During the state's investigations leading up to Ted Suhl's 2016 trial for bribery and fraud, some Arkansas legislators publicly stated that the discovery they obtained during their investigation revealed "there was inordinate spending in Arkansas, compared with other states, on expensive residential care rather than community-based services."

118.    Suhl was able to charge the state of Arkansas higher rates for treatment provided as compared to other states.

119.    In or around July 2016, a federal jury in the Eastern District of Arkansas, located in Little Rock, found Ted Suhl guilty of four out of the six counts against him in what prosecutors alleged was a scheme to bribe a high-ranking Arkansas official. The jury found Ted Suhl guilty of two counts of honest services fraud, one count of bribery involving federal funds, and one count of interstate travel in aid of bribery.

120.    During the trial, which began July 13, 2016, prosecutors with the U.S. Department of Justice sought to show through testimony and evidence, including recorded phone calls, that on multiple occasions between 2007 and 2011 Ted Suhl bribed Steven B. Jones, then deputy director of the state Arkansas Department of Human Services, in exchange for official acts to benefit Suhl and his mental-health businesses, including the Lord's Ranch.

121.    Prosecutors said Ted Suhl had a series of meetings at restaurants with Jones and a third participant in the scheme, Phillip Carter, a former West Memphis city councilman and a former Crittenden County juvenile probation officer, so Ted Suhl could request help from Jones.

122.    According to prosecutors, Ted Suhl gave checks to Carter that were made out to the 15th Street Church of God in Christ in West Memphis, and Carter took the checks to the church, received cash for them and provided cash to Jones. John Bennett, who was the church's pastor at the time, died in 2014 without ever being charged in the case.

123.    A U.S. attorney prosecuting Ted Suhl alleged that: "Putting Jones on Suhl's illicit payroll paved the way for more than $1.5 million in profits for Suhl's juvenile mental health counseling business."

124.    Ted Suhl's two accomplices who were still alive at the time pleaded guilty to the related criminal charges prior to Ted Suhl's July 2016 criminal trial in Little Rock, AR. Steven B. Jones was sentenced in February 2016 to two and a half years (30 months) in prison. As part

of his plea agreement, he admitted he accepted more than $10,000 from Ted Suhl. Phillip Carter

was also sentenced in February 2016 to two years (24 months) in prison after admitting he

funneled bribes from Ted Suhl to Steven B. Jones.

125.    A federal judge sentenced Ted Suhl to seven years (84 months) in prison for his

part in a scheme to bribe a former deputy director of the Arkansas Department of Human

Services. The judge also sentenced Suhl, who owned two mental health companies in Arkansas,

including the Lord's Ranch later renamed Trinity Behavioral Health, to pay a $200,000 fine.

126.    In January 2017, Ted Suhl reported to the Arkansas Department of Correction

after a federal judge denied Suhl's request to stay his prison sentence until the appeals ran their

course.

127.    In March 2018, the Eighth Circuit Court of Appeals upheld Ted Suhl's 2016

convictions and correlating prison sentence and fine, citing Suhl's effort to increase his

companies' Medicaid reimbursement rates by bribing the state official.

128.    In July of 2019, President Donald Trump commuted Ted Suhl's prison sentence

and Suhl was freed after serving less than three years of his seven-year sentence.

**D.**    **Facts Specific to John Does 1-8 (who are NOT Plaintiffs in *this* suit)**

*Figure 5, Photograph of Emmett Presley at the Lord's Ranch*

129.    **John Doe 1** was sent to Lord's Ranch in or around 1997 and remained until 2000. While a minor resident of Lord's Ranch, he was sexually molested and raped by Emmett Presley dozens of times, at nearly every weekly counseling session, over an approximately two-year period. The abuse included but was not limited to oral rape, genital molestation, and child pornography, as Presley sometimes took photos of what he was doing to Plaintiff.

130.    After the first few months of regularly occurring sexual abuse by Emmett Presley, John Doe 1 told staff member Gary Jackson, who then brought in staff member Philander Kirk and senior administrator Alonso Jiles to hear John Doe 1's account of the sexual abuse. The three men called him a liar and told them that the consequences would be severe should he ever utter another word about the abuse. A week or two later, staff subjected John Doe 1 to a violent physical restraint in which they broke his collarbone, ostensibly over the trivial offense of looking at girls during church, but this was actually a warning from the Suhl family, a reminder to John Doe 1 of how much worse things could get should he report the sexual abuse by Presley.

30

Emmett Presley continued to sexually molest and orally rape John Doe 1 on a near weekly basis for at least another year after this.

131.    **John Doe 2** was sent to Lord's Ranch as a minor and remained there from approximately 1991 to approximately 1995. While a minor resident of the Lord's Ranch, he was orally raped and sexually molested by Emmett A. Presley on multiple occasions beginning in or around 1992.  Two of the incidents occurred in John Doe 2's bedroom in the Murphy House. Both times Presley promised John Doe 2 that he would help him get to go home if he submitted to the oral rapes.

132.    John Doe 2 reported the first rape directly to Executive Director Bud Suhl.  John Doe 2 was promptly brought into a room and made to sit on the floor where he was surrounded by Bud Suhl and several other staff, including Ted Suhl, Philander Kirk, Todd Isaacs and Alonza Jiles, and asked to repeat the allegation. Afterwards, he was warned never to repeat it again.  Bud Suhl, Ted Suhl, and the other men told John Doe 2 that if he ever spoke of it again, they would force him to live in isolation in an abandoned building on the edge of the property.  They then made him remain sitting on the floor for over an hour so that he could reflect upon his actions in shame.  Neither Bud Suhl, Ted Suhl, nor anyone else did a thing to help John Doe 2 and John Doe 2 was indeed raped again by Emmett Presley after having notified these staff members.

133.    **John Doe 3** was a minor resident at the Lord's Ranch beginning in approximately 1999.  He was sexually abused as a minor by Emmett A. Presley, his counselor, on numerous occasions. The sexual abuse included but was not limited to fondling of John Doe 3's genitals and oral rape. The abuse occurred in Presley's car.

134.    John Doe 3 reported the sexual abuse to Lord's Ranch staff members Gary Jackson and Steven Marlow, who feigned surprise and concern, but failed to follow up or take

action to stop the abuse from continuing. John Doe 3 also reported the abuse to his mother, who

called the Lord's Ranch and was told by the Suhl family that her son was emotionally disturbed

and making up this lie in order to get attention and in order to go home early. The sexual abuse

continued.

135.    **John Doe 4** was at Lord's Ranch from around 1995/1996 until around 2003/2004.

In around 1995/1996, he was sent to Lord's Ranch from Chicago, Illinois. His grandmother and

mother were led to believe that Lord's Ranch was a safe place away from the dangers of the

City.

136.    Shortly after arriving at Lord's Ranch, he was assigned Emmett A. Presley as his

counselor, who John Doe 4 understood was the head counselor. Defendant Presley drove John

Doe 4 down a country road with another older resident in the back of the car. Presley pulled

over, and asked John Doe 4 whether he would like to drive his car. John Doe 4 was only around

10-12 years old at the time. He said yes. When John Doe 4 was in driver seat, Presley began to

grab his thighs and grope him, causing John Doe 4 to hit the brakes. Presley began grabbing John

Doe 4's shoulders, telling him that this is how he will take care of him, he will buy John Doe 4

things, and even let his mother come visit if he will agree to meet Presley's sexual needs. John

Doe 4 told Presley he did not feel comfortable and did not want to do this.

137.    Suddenly, the older resident Presley brought with them grabbed John Doe 4 by

the throat, said "don't move, let [Presley] do what he wants to do." Presley then performed oral

sex on John Doe 4, and then forced John Doe 4 to perform oral sex on him. John Doe 4 was

crying throughout the ordeal.

138.    Afterwards, Presley threatened John Doe 4, stating "If you tell anyone I'm going

to make sure [the older resident] gets you ... You won't make it out of the Ranch alive ... I run

everything here … I'm the one who gets you phone calls. I'm the one who gets you visits … No one is going to believe you." After this first incident of sexual abuse, John Doe 4 was dropped off at the Lord's Ranch School. He reported the abuse to Deputy Administrator Alonza Jiles.

139.    The next day Alonza Jiles brought John Doe 4 to the main office to meet with Ted Suhl, where John Doe 4 reported the sexual assault and rape. Ted Suhl and Alonza Jiles listened and then did nothing to help John Doe 4. When Presley saw John Doe 4 again, he smirked at him and told John Doe 4 "I told you, I told you." The older resident who helped Presley sexually assault John Doe 4 told John Doe 4 "you better just get with the program." Presley continued serving as John Doe 4's counselor, and sexually abused John Doe 4 on a regular basis for the next few years. Ted Suhl and Alonza Jiles made the intentional decision to allow Presley to continue molesting and raping John Doe 4 for the next three to four years.

140.    During John Doe 4's long tenure at The Lord's Ranch, John Doe 4 was also sexually assaulted by two other staff as well as an older resident. All of the incidents were reported to Alonza Jiles, who failed to take action to investigate or protect John Doe 4.

141.    One of the incidents of sexual assault involved a staff member, R.L., who physically beat John Doe 4 viciously one day, including slamming John Doe 4's head into the floor. John Doe 4 was crying during the physical attack, and another staff member ultimately had to intervene. Shortly thereafter, the staff member, R.L., entered John Doe 4's bedroom in the middle of the night, pulled his pants down, and attempted to sexually assault him. John Doe 4 reported the assault to staff members Alonza Jiles and Don Rubin. Don Rubin laughed off the allegation. Alonza Jiles stated he would look into the matter, but never followed up.

142.    John Doe 4 was one of the youngest residents at the time he arrived at The Lord's Ranch, and was housed with older residents.  When he was around 10-12 years old, he was

sexually assaulted by one of the older residents. John Doe 4 reported the abuse to Alonza Jiles, who failed to investigate and otherwise took no action to protect John Doe 4.

143.    During John Doe 4's long tenure at The Lord's Ranch, he made several reports to Alonza Jiles regarding other younger residents who had been physically and/or sexually assaulted. Alonza Jiles failed to take action to investigate the alleged perpetrators or otherwise protect the minor victims.

144.    During John Doe 4's long tenure at The Lord's Ranch, from approximately 1995/1996 – 2003/2004, staff regularly made threats of sexual violence. As just one example, when physically restraining residents, many staff would make comments to residents about getting used to the abuse they were subjected to because they will experience the same when/if they go to jail, such as "this is what will happen to your ass in jail. So you may as well get used to it."

145.    **John Doe 5** was sent to Lord's Ranch from Chicago, Illinois in around 1994, when he was approximately 14/15 years old, and stayed until around 1997. Staff from Lord's Ranch came to Chicago, Illinois, spoke to his mother, and convinced her Lord's Ranch was a good, safe place to send John Doe 5.

146.    Shortly after arriving at Lord's Ranch, he was assigned Presley as his counselor. Within weeks of his arrival, Presley took John Doe 5 in his car to a secluded area near Lord's Ranch where he sexually abused and orally raped him. The abuse included Presley performing oral sex on Plaintiff John Doe 5 and forcing John Doe 5 to perform oral sex on him. To coerce him, Presley would tell John Doe 5 that he had the power to send him home or send him to jail, and that if he didn't allow him to do what he wanted to do, there would be consequences. John Doe 5, who came from a family with limited education and means, felt trapped.

147.    John Doe 5 reported the abuse to Gary Jackson, Alonza Jiles, and Steven Marlow.

148.    He also reported the abuse to Michael Gipson, another counselor at Lord's Ranch, telling him "I don't want to be around Presley because he's a f*n pedophile." At all relevant times, Presley was Michael Gipson's supervisor. Gipson's response to John Doe 5 suggested he was already aware Presley abused residents.

149.    John Doe 5 was sexually abused by Presley at least one more time after reporting the sexual abuse to staff. The abuse ended when he was eventually permitted to switch counselors.

150.    **John Doe 6** was sent to the Lord's Ranch as a minor from the Chicago area in or around 2000 and was there until approximately 2004. John Doe 6 was sent to the Lord's Ranch because he struggled emotionally and academically.

151.    John Doe 6 was sexually abused by Emmett A. Presley on numerous occasions as a minor. The sexual abuse occurred on a regular basis, regularly occurring in Presley's car during drives on The Lord's Ranch property. Presley's sexual abuse of John Doe 6 included but was not limited to fondling of his genitals, oral rape, and attempted sodomy.

152.    John Doe 6 reported the sexual abuse to a Lord's Ranch staff member in approximately late 2000 or early 2001; nothing was done and Presley's sexual abuse of John Doe 6 continued unabated.

153.    While residing at the Lord's Ranch, John Doe 6 was also subjected to relentless bullying and excessive physical violence by the staff, including and particularly Gary Jackson, Stan Jackson, and Tyree Davis. These staff members regularly called, described, and referred to John Doe 6 with derogatory and humiliating names, including regularly calling him among other names "a fag," "a faggot," and "gay," often in public or otherwise in front of other residents.

The humiliating and demeaning way the staff treated John Doe 6 led other residents to follow their lead and bully and humiliate John Doe 6 in the same manner. Staff would laugh when John Doe 6 was called "a fag" or bullied.

154.    In one particularly traumatic incident for John Doe 6, a staff member named Gary Jackson brought John Doe 6 to "the Unit," a house where residents were brought for punishment, put him in a corner, and then spit right in his face. Gary Jackson then told John Doe 6 "this is what they're going to do to you when your gay ass is in jail."

155.    Whenever John Doe 6 verbally or physically fought back against the relentless bullying and abuse, staff were particularly physical and violent toward him, often subjecting him to excessive violence for minor infractions, including but not limited to choking John Doe 6, beating him up, and punching or slapping him in the chest and body. The beatings would cause John Doe 6 to cry sometimes, yet staff rarely if ever showed sympathy.

156.    **John Doe 7** was a minor resident at the Lord's Ranch from approximately 1999 to 2003. His counselor at the Lord's Ranch, Emmett A. Presley, sexually assaulted John Doe 7 and attempted to rape John Doe 7 orally. At the time John Doe 7 was abused, and at all relevant times, Lord's Ranch staff were well aware of what Presley was doing to children at the facility, yet the administration and the Suhl family allowed him to continue to sexually abuse children with impunity.

157.    John Doe 7 was also subjected to excessive physical abuse by staff, which during one attack resulted in a broken arm. John Doe 7 complained to the staff about his injured arm, but was never taken to a hospital, and never received necessary treatment for the injury.

158.    **John Doe 8** was sent to Lord's Ranch from Chicago, Illinois in or around 1991/1992 and stayed at the facility until around 1994. John Doe 8 was sexually abused on multiple occasions as a minor by two staff members.

159.    One of those abusers was Defendant Presley, who was John Doe 8's assigned counselor at The Lord's Ranch.

160.    Upon information and belief, as part of his motus operandi, Presley would use his position as a counselor to get access to and read his victims' medical records so he was familiar with their vulnerabilities, including whether they came from a broken home and whether they had been physically or sexually abused and/or neglected prior to arriving at the Lord's Ranch.

161.    During this first incident of abuse, Presley drove John Doe 8 to a secluded area near Lord's Ranch, asked him if he wanted to learn to drive, and when John Doe 8 got into the driver's seat, Presley began to grope his thigh and fondle him, and then progressed to oral rape. The sexual abuse by Presley on this occasion and others included but was not limited to oral rape.

162.    After the first instance of sexual abuse by Presley, John Doe 8 reported it to another staff member, Todd Isaacs. Todd Isaacs asked John Doe 8 who else he told, and then told John Doe 8 not to tell anyone else.

163.    At all relevant times, it was well known amongst the residents and staff at Lord's Ranch, including specifically Shirley Suhl, Bud Suhl, and Ted Suhl, that Presley was regularly sexually abusing and raping children, and that he was using his position of power and authority over the children to coerce them into compliance. The Suhl family knowingly bestowed Presley with the power and authority to commit his crimes against children. The Suhl family, including specifically Shirley Suhl and Ted Suhl, quite literally condoned Presley's sexual abuse of

children at the Lord's Ranch.

164.    As part of his grooming technique, Presley would buy gifts and clothing for his victims, food off campus, give them cigarettes, or allow them to drive his car. He would also give pornographic magazines to the boys. For boys that did not comply with his abuse and "the program," however, Presley would threaten to send them to jail, prevent them from going home, limit or prevent their ability to call their parents, and/or utilize other residents under his sway to terrorize them.

165.    Lord's Ranch staff such as Gary Jackson, Philander Kirk, and Tyree Davis would laugh, smile, or otherwise make jokes when residents were leaving to meet with Presley or were being dropped off with gifts after seeing him (an indicator the boy was sexually abused).

166.    Children at the Lord's lived in constant fear, knowing that they were alone in a remote, unfamiliar environment far from home and at the complete mercy of a sadistic staff. For many children, survival meant compliance with the physical and sexual abuse. The youngest residents were often subjected to the worst abuse, and afforded little to no protections from staff when they reported abuse.

### E.   Facts Specific to Plaintiffs John Does 9-16 (the PLAINTIFFS IN THIS SUIT)

167.    Plaintiff **John Doe 9** was sent to Lord's Ranch from Chicago in or around 2000 and remained until around 2003. While a minor resident of Lord's Ranch, he was sexually molested and raped by Emmett Presley on numerous occasions.  The abuse included but was not limited to oral rape, genital molestation, and being forced to engage in sexual acts with another minor resident in Presley's presence.

168.    During one of the incidents of abuse, Emmett Presley pulled Plaintiff out of class and took Plaintiff and another minor resident for a ride in his car around the backroads

surrounding the Lord's Ranch campus. Presley pulled over, pulled out his penis, and started

masturbating in front of John Doe 9 and the other minor resident (referred to herein as Child Doe

B). Presley then performed oral sex on Child Doe B in Plaintiff's presence. Presley then ordered

Plaintiff to perform oral sex on Child Doe B.

169.    After sexually abusing his victims, such as John Doe 9, Presley would often take

them to a store to purchase candy and other snacks. It was common knowledge amongst staff and

other residents that when a resident was returning to the Lord's Ranch campus with snacks

purchased by Defendant Presley, it meant the resident had been sexually abused by him. Because

he was known to be one of the victims of Presley, Plaintiff was referred to as a "homosexual"

and relentlessly tormented and teased for being a Presley victim.

170.    John Doe 9 reported the abuse to Philander Kirk and wrote Alonzo Jiles a letter

regarding the abuse, but nothing was done to prevent abuse or otherwise protect Plaintiff, and the

abuse continued to occur unabated.

171.    Plaintiff was also regularly physically abused by staff.

172.    Plaintiff **John Doe 10** was sent to Lord's Ranch from Chicago as a minor, where

he stayed from approximately 1993 to approximately 1996. By 1993, both of Plaintiff's parents

were deceased, and he struggled emotionally. While receiving treatment at the Henry Horner

Children's Center in or around Oak Park, Illinois, Plaintiff recalls that a social worker

recommended the Lord's Ranch to Plaintiff's grandparent and showed him a promotional

pamphlet highlighting the Lord's Ranch's therapeutic program and campus. Upon information

and belief, the social worker was friendly with and/or knew Patty Suhl.

173.    One day in or around 1993 Bud Suhl arrived in the Chicagoland area to pick John Doe 10 up and transport him to the Lord's Ranch. During his first week at the Lord's Ranch, Plaintiff was physically abused by staff member Philander Kirk.

174.    Defendant Emmett Presley was assigned to be John Doe 10's counselor. Presley had access to Plaintiff's medical charts and knew Plaintiff's vulnerabilities, and the fact his parents were deceased. Presley also knew Plaintiff loved his grandmother and used Plaintiff's feelings of loneliness, isolation, and longing for the connection and affection of his grandmother to coerce him and sexually abuse him. Presley would tell Plaintiff that if he succumbed to the abuse, Presley would call Plaintiff's grandmother on his phone and allow him to speak with her. After the abuse, Presley would dial numbers on his phone, the phone would continue to ring, and he would tell Plaintiff they would just have to try to call later. Upon information and belief, Presley would only pretend to call Plaintiff's grandmother.

175.    While a minor resident of the Lord's Ranch, John Doe 10 was orally raped and sexually molested by Emmett A. Presley on multiple occasions from around 1993-1996.  The abuse would take place in Presley's car. Presley would take Plaintiff on car rides around the Lord's Ranch campus where he would pull over in a secluded area to sexually abuse him.

176.    The Lord's Ranch Defendants were well aware that Presley was sexually abusing male residents well before Plaintiff's abuse; despite this, they did nothing to protect Plaintiff or stand in Presley's way.

177.    Plaintiff **John Doe 11** was a minor resident at the Lord's Ranch who arrived there in around 1995-1996 when he was around 15 or 16 years old.  He was sexually abused as a minor by Emmett A. Presley, his counselor, on numerous occasions. The sexual abuse included but was not limited to molesting and fondling of Plaintiff's genitals and attempted oral sex.

Plaintiff told Defendant Presley to stop, but Presley continued abusing Plaintiff. The abuse

occurred in Presley's car.

178.    Defendant Presley threatened Plaintiff after the abuse, and told him that if he

reported the abuse to anyone he would be punished and no one would believe him.

179.    While at the Lord's Ranch, Plaintiff was regularly physically and emotionally

abused by Gary Jackson and Philander Kirk.

180.    The Lord's Ranch Defendants knew Presley was sexually abusing male residents

well before John Doe 11's abuse; despite this, they did nothing to protect Plaintiff or hinder

Presley's access to Plaintiff.

181.    Plaintiff **John Doe 12** was at Lord's Ranch from around 1995 until around 1997.

He was sent to Lord's Ranch from Chicago, Illinois. Plaintiff was sexually abused on numerous

occasions by Defendant Emmett A. Presley, who was his designated counselor. The abuse

included sexual molestation, groping, and oral rape.

182.    Defendant Presley would take Plaintiff on nature walks as part of his therapy and

then sexually abuse him.

183.    During one incident of abuse, Presley pulled John Doe 12 out of class, brought

him to a trailer near the school building, and sexually abused him.

184.    After the second incident of sexual abuse, John Doe 12 reported the abuse to

Philander Kirk, who feigned concern and said he would check on it. Plaintiff was never

interviewed by any other staff or law enforcement, no examination of him was performed, and he

is unaware of any report being made regarding his allegation of sexual abuse. Philander Kirk

never followed up with Plaintiff regarding the abuse.

185.    After reporting the abuse to Philander Kirk, Presley continued to sexually abuse Plaintiff. As was the case with the many other Presley victims, the report was ignored by the Lord's Ranch Defendants and the rapes continued.

186.    Presley would use intimidation and threats to force Plaintiff to continue to meet Presley's depraved sexual needs. Presley would tell Plaintiff he was very far from home, that no one would believe him, that there was no help coming, and strongly implied that something bad would happen to him if he ever stopped complying.

187.    Alonza Jiles was also specifically made aware that Presley was sexually abusing John Doe 12, and even told Plaintiff he was looking into the matter. Jiles did nothing, and the sexual abuse continued.

188.    Plaintiff was also physically abused at the Lord's Ranch. During one incident, staff member Todd Isaacs threw Plaintiff on the ground and put so much pressure on his face his skin scraped off and his shoulder was severely injured. Plaintiff was offered no medical treatment after, and still suffers from the shoulder injury to this day.

189.    To minimize the risk residents of Lord's Ranch would report abuse to their parents, family members, or guardians during the sparse phone calls they were afforded, Lord's Ranch staff would always be present when phone calls were made by residents. For Plaintiff's phone calls home, Bud Suhl would make the phone call, speak to John Doe 12's family, and guide the conversation between Plaintiff and his mother in order to make sure the truth did not get out.

190.    Plaintiff **John Doe 13** was placed at the Lord's Ranch from approximately 1996, when he was around 13 or 14 years old, until around 1998. When Plaintiff was around 13 or 14

years of age, Presley began to groom and sexually abuse him. Plaintiff was sexually abused and orally raped by Presley on numerous occasions.

191.     Presley told Plaintiff that he could improve his living conditions at the Ranch and make sure everyone took it easy on him. And when Plaintiff responded that he would like that, Presley then began groping Plaintiff's inner thigh and then stuck his hand inside Plaintiff's pants and began masturbating John Doe 13. Presley's sexual abuse of Plaintiff escalated to oral rape. The abuse by Presley occurred in Presley's car.

192.     Plaintiff was also sexually abused on numerous occasions by a staff member named Jeff, believed to be from Haiti. Jeff forced Plaintiff and another minor resident (herein referred to as Child Doe C) to get naked and lay down on Jeff's bed. He then forced them to perform sexual acts on one another as well as on Jeff.

193.     Plaintiff was regularly physically abused and beaten by Lord's Ranch staff members. One staff member, a counselor named Rick Reynolds, choked Plaintiff until he gave him the money Plaintiff's parents sent him. Staff members Gary Jackson and Rick Reynolds also instructed older boys to beat Plaintiff.

194.     John Doe 13 still suffers from a shoulder injury caused by physical abuse at Lord's Ranch.

195.     When Plaintiff would attempt to report abuse to his mother, Lord's Ranch staff would cut the call and otherwise take actions to prevent him from reporting the abuse.

196.     John Doe 13 reported the sexual abuse directly to Gary Jackson and Philander Kirk. John Doe 13 was taken to the main house where Ted Suhl's office was located, where he also told Ted Suhl that he was being sexually abused by Presley and by Jeff.  Ted Suhl became

43

angry, called John Doe 13 a liar, and told him if he kept making false accusations that he won't get to see his family again or make any calls home.

197.    The sexually abuse, of course, continued after this encounter with Ted Suhl, who simply had no interest in preventing it – yet another specific example of the Suhl family condoning child rape at the Lord's Ranch.

198.    Plaintiff **John Doe 14** was a minor resident at the Lord's Ranch from approximately 1993 to 1998.  His counselor at the Lord's Ranch, Emmett A. Presley, regularly sexually abused Plaintiff while he was at the Lord's Ranch.

199.    Plaintiff **John Doe 15** was sent to the Lord's Ranch as a minor from Chicago, Illinois in or around 1994 and stayed at the facility until around 1998.  The head counselor at the Lord's Ranch, Emmett A. Presley, regularly sexually abused Plaintiff while he was a minor residing at the facility. Presley would coerce Plaintiff by telling him things such as "I have the power to send you to jail."

200.    John Doe 15 reported the abuse to staff including Philander Kirk, Alonza Jiles, Bud Suhl, and Ted Suhl. Nothing was done to protect Plaintiff and the sexual abuse continued unabated.

201.    Staff including Defendant Presley sought to punish Plaintiff for reporting the abuse and intimidate him into silence by, among other things, ordering him to "keep [his] mouth shut" and making statements such as "What you thought I wouldn't find out? I've been working here a long time . . . and they're [the staff] are going to tell me everything you say about me."

202.    Plaintiff was also subjected to excessive physical abuse by staff causing physical injuries to his right arm, such as torn ligaments, which he still suffers from today.

203.    Plaintiff **John Doe 16** was sent to Lord's Ranch from Chicago, Illinois in or

around 1994 and stayed at the facility until around 1999. Patty Suhl and Bud Suhl were involved in Plaintiff's transport from Chicago to the Lord's Ranch. At all relevant times, he was a minor. The head counselor at the Lord's Ranch, Emmett A. Presley, regularly sexually abused Plaintiff for years while he was a minor residing at the facility.

204. During his tenure at the Lord's Ranch, John Doe 16 reported the abuse to several staff members, including Philander Kirk, a staff member named Bill, a staff member named Charles, and Bud Suhl. Lord's Ranch staff failed to take any actions to protect Plaintiff, and the child sexual abuse continued. Bill told Plaintiff, "What do you want me to do about it?" Charles told Plaintiff that he was lying, and that Plaintiff had to recant in the name of Jesus and atone. When Bud Suhl was told, he responded saying: "Staff here are good people, they're here to help people, and you're going to be okay...."

**F. Lord's Ranch Defendants Clearly Breached their Duty of Care.**

205. At all times relevant to this complaint, The Lord's Ranch Defendants owned, operated, maintained, staffed, and supervised mental health counseling and education programs in Warm Springs, AR.

206. At all relevant times, The Lord's Ranch Defendants, through their agents, employees, and officials, had control and supervisory authority over The Lord's Ranch's mental health counseling and education programs and over the staff and other agents administering the programs.

207. At all relevant times, The Lord's Ranch Defendants had the power to hire, appoint, supervise, monitor, restrict and fire each person, including staff, working with residents in the mental health counseling and education programs.

208.    At all times relevant, The Lord's Ranch's employees and agents staffed and operated the mental health counseling, education, and residential programs. In doing so, The Lord's Ranch Defendants' agents and employees were required and authorized as part of their agency duties to interact with, mentor, supervise, and provide mental health counseling and reform to youths participating in the residential programs.

209.    All staff members of Lord's Ranch were charged with, among other tasks, supervision and monitoring of the residents at the Lord's Ranch, including Plaintiffs.

210.    The Lord's Ranch Defendants had a duty to supervise its staff members during their respective employment with The Lord's Ranch.

211.    At all times relevant, the staff members of The Lord's Ranch were empowered by The Lord's Ranch to run and operate the facilities. In doing so, the staff were expected to interact with, mentor, supervise, educate, and oversee the residents, including The Plaintiffs.

212.    The staff at The Lord's Ranch, including Defendant Emmett A. Presley, used their positions of power and authority vested in them by The Lord's Ranch to sexually and psychologically abuse countless children residing at The Lord's Ranch, including these Plaintiffs.

213.    As a direct and proximate result of the wrongful acts and omissions of Defendants, as described herein, Plaintiffs have suffered and continue to suffer injuries and damages, including without limitation severe pain and suffering of body and mind; shock; severe and permanent emotional distress; physical manifestations of the aforesaid emotional distress; terror; embarrassment; loss of self-esteem; disgrace; humiliation; and loss of enjoyment of life; have sustained and will continue to sustain lost education, loss of earnings, and lost earning

46

capacity; and have incurred and will continue to incur severe psychological injury and incur

expenses for medical and psychological treatment, therapy and counseling.

## CAUSES OF ACTION

### COUNT ONE – NEGLIGENT SUPERVISION
### (All Plaintiffs vs. The Lord's Ranch Defendants)

214.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set

forth herein.

215.    Negligent supervision and retention hinges on the element of foreseeability.

Where there is foreseeability, employers have a duty to control an employee for the protection of

third parties even where the employee is acting outside the scope of employment. *Regions Bank*

*& Trust v. Stone County Skilled Nursing Facility, Inc.* 345 Ark. 555, 568, 49 S.W.3d 107, 115

(2001). Emmet Presley's sexual abuse and exploitation of these Plaintiffs was foreseeable to

Lord's Ranch Defendants, and they had a duty to control and supervise him for the protection of

Plaintiffs. It is "not necessary that the employer foresee the particular injury that occurred, but

only that the employer reasonably foresee an appreciable risk of harm to others." *Saine v.*

*Comcast Cable Vision of Arkansas, Inc.*, 354 Ark. 492, 126 S.W.3d 339 (2003).

216.    In this case, the exploitation and abuse suffered by Plaintiffs was specifically

foreseeable to the Lord's Ranch Defendants. As detailed in preceding sections herein, the Lord's

Ranch Defendants were fully and absolutely aware that Presley was a savage and habitual child

rapist, and they made the very conscious and intentional decision to allow Presley to victimize

these Plaintiffs despite their awareness. They were also aware of the systemic physical and

sexual abuse perpetrated by other staff members.

217.    This negligent supervision was the proximate cause of Plaintiffs' injuries, their injuries being the natural and probable consequence of the Lord's Ranch Defendants' negligence.

218.    At all relevant times, The Lord's Ranch Defendants knew, or in the exercise of reasonable care should have known, that Presley and the other abusive staff members presented a risk of danger to Plaintiffs and other residents.  See *Regions Bank & Trust*, 345 Ark. At 568, 49 S.W.3d at 113.  *See also Saine,* 354 Ark. At 497, 126 S.W.3d at 342.  Despite this, they did nothing to control these predators.

219.    The Lord's Ranch Defendants also failed to inform, educate, or train its staff in how to identify, prevent or respond to incidents of child sexual abuse; warn residents in their programs (and their parents and legal guardians) about this known danger; implement reasonable and feasible child abuse prevention policies; alert authorities to the nature and scope of this known danger, as required by law; investigate any reports of staff misconduct; or fire, discipline, or remove Presley, and other staff, or otherwise prevent them from accessing Plaintiffs on or off the grounds.

220.    As a result of this authority, Plaintiffs were conditioned to trust Presley, to comply with his directions, and to respect his authority.  Lord's Ranch Defendants placed Plaintiffs in this situation despite having known or having should have known of the continuing danger to Plaintiffs and other residents of Lord's Ranch posed by Presley.

221.    Moreover, at all relevant times, Lord's Ranch Defendants actively misled the public, parents, guardians, and administrators from child services agencies regarding the quality and trustworthiness of the staff at the Lord's Ranch, and the serious dangers to its residents.

## COUNT TWO – NEGLIGENT RETENTION
### (All Plaintiffs vs. The Lord's Ranch Defendants)

48

222.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

223.    The Lord's Ranch Defendants were negligent in their retention of numerous abusive staff including and particularly Emmett A. Presley.  This negligence was a proximate cause of Plaintiffs' damages described in this Complaint.  Lord's Ranch Defendants knew or in the exercise of reasonable care should have known that Presley and other staff subjected Plaintiffs and other residents to an unreasonable risk of harm.

224.    For the reasons described throughout this Complaint, the Lord's Ranch Defendants' decision to continue to retain abusive staff including Presley for as long as they did, despite their knowledge of the dangers they presented to Plaintiffs, was negligent and a proximate cause of Plaintiffs' damages.

## COUNT THREE – NEGLIGENCE
### (All Plaintiffs vs. all Defendants)

225.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

226.    At all relevant times, Defendants owed a duty of care to Plaintiffs, as described herein.

227.    This duty included a duty not to subject Plaintiffs to an unreasonable risk of harm.

228.    At all relevant times hereto, Defendants and their agents were required to consider Plaintiffs' capacity to care for themselves and to protect them from foreseeable dangers, including those created by their conditions as vulnerable minors.

229.    At all times relevant hereto, Defendants owed a duty of ordinary care to the children in its facilities, including Plaintiffs.

230.    At all times relevant hereto, it was within the scope of Defendants' professional services to provide a safe environment to the children in residence at the facility.

231.    At all times relevant hereto, Defendants had a duty to protect the children in its residential programs from foreseeable harm.

232.    At all relevant times hereto, Defendants and their agents had a duty to furnish the care and attention reasonably required by the children residing at the facility.

233.    At all relevant times hereto, Defendants and their agents had a duty to not mislead the public, parents, guardians, and administrators from child service agencies regarding the dangers at the Lord's Ranch.

234.    Defendants breached their duties to Plaintiffs.

235.    Defendants' breach of these duties duty was a proximate cause of Plaintiffs' injuries.

236.    The harm suffered by Plaintiffs was foreseeable to Defendants, and they knew or should have known that Emmett Presley and the other abusive staff presented an unreasonable risk of harm to Plaintiffs.

237.    At all relevant times hereto, Lord's Ranch Defendants, as well as staff and agents, had statutory and common law duties to monitor the welfare of the children in the counseling and residential facilities and to report any suspected abuse or neglect of such children to authorities.

238.    At all relevant times hereto, Defendants' staff and agents were mandated reporters, as defined in the Arkansas Child Maltreatment Act.

239.    Lord's Ranch Defendants and its agents failed to report reasonable suspicions of child maltreatment.

240.    Defendants failed to establish clear boundaries and codes of conduct to be observed by staff when interacting with minor residents.

241.    Defendants failed to put in place policies and protocols to keep Plaintiffs and others in the facilities safe from sexual predation.

242.    Defendants failed to discipline instances of sexual abuse such that they established and fostered a culture of sexual exploitation amongst staff and residents.

243.    Defendants failed to notify minor residents or their guardians of the known danger.

244.    In addition to knowingly exposing Plaintiffs and others to sexual predators, Defendants failed to inform, educate, or train its staff in how to identify, prevent or respond to incidents of child sexual abuse; warn children in their programs (and their parents and guardians) about this known danger; implement reasonable and feasible child abuse prevention policies; alert authorities to the nature and scope of this known danger, as required by law as a mandatory reporter; investigate any reports of staff misconduct; supervise youths participating in ministry programs; or fire, discipline, or remove abusive staff such as Presley or otherwise prevent them from accessing Plaintiffs.  As a result, abusive staff such as Presley groomed and sexually abused these Plaintiffs and others.

245.    For all of the reasons described herein, Defendants breached their duties to Plaintiffs.  As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered injuries and damages.

## COUNT FOUR – NEGLIGENT PATIENT CARE
### (All Plaintiffs vs. All Defendants)

246.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

247.    At all relevant times, Defendants had a duty to supervise Plaintiffs, and the other minor residents in their care, as described herein.

248.    The theory of negligent patient care hinges on the relationship between the care provider and the patient. *Regions Bank & Tr. v. Stone Cty. Skilled Nursing Facility, Inc.,* 345 Ark. 555, 564, 49 S.W.3d 107, 112-113 (2001) (quoting *Niece v. Elmview Grp. Home*, 131 Wash. 2d 39, 929 P.2d 420 (1997)). The Lord's Ranch, as a care provider and mental counseling facility for juveniles, had a duty to supervise Plaintiffs, and all other minors in its care.

249.    A care facility is required to consider the patient's capacity to care for himself or herself and to protect the patient from dangers created by his or her weakened condition. Providing a safe environment for patients is within the scope of the professional services of a facility like Defendants'. See *Sexton v. St. Paul Fire & Marine Ins. Co.* 275 Ark. 361, 631 S.W.2d 270 (1982). Arranging for a safe environment for residents and patients of a mental health counseling facility is well within the scope of the professional services of the Lord's Ranch Defendants. Therefore, Defendants were required to take Plaintiffs' capacity as minor children to care for themselves into account in their supervisory capacity.

250.    At all times relevant hereto, the Lord's Ranch represented itself as a mental counseling facility for troubled youth.

251.    At all times relevant hereto, it was within the scope of Lord's Ranch's professional services to provide a safe environment for the minor residents in its care.

252.    At all times relevant hereto, Lord's Ranch failed to investigate complaints of sexual abuse and exploitation made by Plaintiffs and others against Emmett Presley and other staff, thereby failing to provide a safe environment for the children in its care.

253.    At all times relevant hereto, the Lord's Ranch, through its staff and agents, was aware of the sexual abuse and exploitation Plaintiffs were experiencing.

254.    Lord's Ranch's failure to provide a safe environment for the children in its care was the proximate cause of Plaintiffs' injuries.

255.    For the reasons described throughout this Complaint, Lord's Ranch's failure to provide a safe environment for the minors in its care was negligent and a proximate cause of Plaintiffs' injuries.

## COUNT FIVE – VICARIOUS LIABILITY FOR NEGLIGENT OR OTHERWISE TORTIOUS ACTS AND OMISSIONS OF ALL AGENTS AND EMPLOYEES
### (All Plaintiffs vs. The Lord's Ranch Defendants)

256.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

257.    The Lord's Ranch Defendants are vicariously liable for all acts and omissions of their agents and employees, including but not limited to Emmett Presley, Alonza Jiles, Gary Jackson, Ted Suhl, Bud Suhl, Shirley Suhl, Todd Isaacs, Steven Marlow, Philander Kirk, Michael Gipson, Tyree Davis, and including those as of yet unknown agents and employees, as described throughout this Complaint.

258.    This count specifically includes, but is not limited to, the negligence and reckless indifference of all the Lord's Ranch Defendants' agents who were made aware that Presley was sexually abusing boys and then made the conscious decision to turn a blind eye, thereby allowing innumerable rapes and molestations by Presley to occur continuously for years. These agents specifically include, but are not limited to, Alonza Jiles, Gary Jackson, Todd Isaacs, Steven Marlow, Philander Kirk, Tyree Davis, Ted Suhl, Shirley Suhl, and Bud Suhl.

259.    As described herein, the known and unknown Lord's Ranch Defendants' agents,

employees, and representatives were all acting within the scope of their authority and employment when these breaches of duty occurred. It was for the benefit of the Lord's Ranch Defendants that these agents committed the acts and omissions described in this pleading, including but not limited to their roles in the coverup.

## COUNT SIX – TORT OF OUTRAGE
### (All Plaintiffs vs. All Defendants)

260.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

261.    Defendants willfully and wantonly engaged in extreme and outrageous conduct.

262.    Defendants' conduct, as described herein, proximately caused the injuries to Plaintiffs.

263.    Defendants betrayed the trust of Plaintiffs and the community in the most egregious manner, given the amount of evidence of danger posed by Emmett Presley and other staff at the Lord's Ranch that Defendants systematically ignored and intentionally covered up for an unreasonably long period of time.

264.    Defendants' conduct was extreme, outrageous, and utterly intolerable in a civilized community. Defendants conduct went beyond all possible bounds of decency.

## COUNT SEVEN – SEXUAL BATTERY
### (All Plaintiffs against Defendant Emmett Presly directly, and
### All Plaintiffs against The Lord's Ranch Defendants under vicarious liability)

265.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

266.    Emmett Presley wrongfully, intentionally, and by force made harmful physical sexual contact with Plaintiffs, all minor children, without legal consent.

267.    Presley was acting within the scope of his employment and authority, and for the

benefit of Lord's Ranch Defendants, and wielding the power of Lord's Ranch Defendants when he sexually abused Plaintiffs.

268.   In the first alternative, acts within the course and scope of Presley's employment led to or resulted in the sexual abuse.

269.   In the second alternative, Presley's sexual abuse of Plaintiffs was aided by his agency for the Lord's Ranch Defendants.

270.   In the third alternative, the Lord's Ranch Defendants ratified Presley's sexually abusive conduct towards Plaintiffs when it chose to retain him.

271.   In the fourth alternative, Presley's tortious conduct, ostensibly, was committed in furtherance of the Lord's Ranch Defendants' goals.

272.   The battery was a proximate cause of Plaintiffs' injuries.  As a direct result of the sexual battery, Plaintiffs have suffered injuries and damages in excess of the amount required for federal diversity jurisdiction.

## COUNT EIGHT
### The Trafficking Victims Protection Reauthorization Act
### U.S.C §1595 ("TVPRA")
### (All Plaintiffs vs. All Defendants)

273.   Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

274.   At all relevant times, Defendants knew that the Lord's Ranch Entities were recruiting children from across the country to attend their facilities, where the children including Plaintiffs were expected to be sexually abused by the owners and/or staff.

275.   Plaintiffs are victims of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

276.   The Defendants' acts, omissions, and commissions, taken separately and/or

together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, the Defendants had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. §1591 (a). At all relevant times, the Defendants breached this duty by participating in, and facilitating, the harboring and providing of Plaintiffs for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

277.    The Defendants have financially benefited as a result of these acts, omissions, and/or commissions. Moreover, the Defendants directly benefitted from the trafficking of Plaintiffs for the duration of time they had each Plaintiff residing at the facility. The actions, omissions, and/or commissions alleged in this pleading were the but for and proximate cause of Plaintiffs' injuries and damages.

278.    Plaintiffs have suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' facilities and properties in violation of 18 U.S.C. §1591 (a).

## COUNT NINE
### VIOLATIONS OF TITLE IX
### (All Plaintiffs vs. The Lord's Ranch Defendants)

279.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

280.    Lord's Ranch Defendants acted with deliberate indifference to physical and sexual assaults and abuse committed to its residents, including Plaintiffs, and failed to report the incidents of abuse to law enforcement as well as other civil and legal authorities such as the Arkansas DHS.

281.    Lord's Ranch Defendants acted with deliberate indifference to physical and

sexual assaults and abuse committed on its residents, including Plaintiffs, and failed to take reasonable steps to ensure that alleged perpetrators of sexual abuse, including Presley, were investigated, monitored, or to otherwise prevent alleged perpetrators, including Presley, from sexually assaulting Plaintiffs and others.

282.    As a direct result of Lord's Ranch Defendants' failure to control abusive staff including Presley at the Lord's Ranch, abusive staff including Presley were able to continue preying upon and abusing children at the facility, including Plaintiffs, and were able to continue to threaten Plaintiffs' safety, which exacerbated the traumatic effects of the sexual assaults.

283.    As a direct result of Lord's Ranch Defendants' indifference, Plaintiffs were wholly deprived of access to The Lord's Ranch's resources; the sexual assaults and abuse were "objectively offensive" acts, which left Plaintiffs too scared, traumatized, and emotionally distraught to fully participate in their education.

284.    As a direct result of Lord's Ranch Defendants' indifference, Plaintiffs continued to suffer the effects and constant fear of repeated attacks and retaliation creating a hostile educational environment, and the hostile environment became "so pervasive" that Plaintiffs' education suffered.

285.    Because of Defendants' deliberate indifference, Plaintiffs suffered severe and permanent injuries, damages and losses, including but not limited to past and future emotional distress, fear, anxiety and trauma; physical and mental pain and suffering; medical and related expenses; and lost wages, and lost future earnings and earning capacity.

### COUNT TEN
### CIVIL ACTION BY A CRIME VICTIM
### (All Plaintiffs vs. The Lord's Ranch Defendants)

286.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set

forth herein.

287.    A person commits *Rape* if…the person engages in sexual intercourse or deviate

sexual activity by forcible compulsion or with a person under the age of 14.  A.C.A. § 5-14-103.

288.    Emmett Presley raped Plaintiffs and sexually assaulted them in other ways. Each

act of rape, as well as each lesser act of sexual assault, gives Plaintiffs a civil cause of action

pursuant to A.C.A. § 16-118-107.

289.    These crimes were a proximate cause of Plaintiffs' injuries. As a direct result of

these crimes, Plaintiffs have suffered injuries and damages in excess of the amount required for

federal diversity jurisdiction.

290.    Plaintiffs shall be entitled to recover their costs *and attorney fees* when they

prevail on this cause of action.

## DAMAGES

291.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set

forth herein.

292.    As a direct result the Defendants' conduct described herein, Plaintiffs have

suffered severe sexual, physical, and psychological abuse, causing severe and permanent injuries

and damages. Those injuries and damages include but are not limited to:

   a.  Severe pain and suffering, including emotional distress and mental
       anguish, past and future;

   b.  Severe and permanent psychological injuries, including but not limited
       to depression, PTST, anxiety disorders, substance abuse disorders,
       intimacy and sexual disorders, loss of self-esteem, shame, and
       humiliation;

   c.  past and future medical expenses, as well as the costs associated with
       past and future life care; and

   d.  past and future lost wages and loss of earning capacity.

293.    Plaintiffs were prevented and will continue to be prevented from obtaining the full enjoyment of life; they will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## AMOUNT OF DAMAGES

294.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

295.    Plaintiffs' injuries and damages are in excess of the minimum amount required for federal court jurisdiction in diversity of citizenship cases, for which Plaintiffs should be awarded a judgment as against Defendants in an amount to compensate them fully and fairly for each and every element of damages they have suffered.

## PUNITIVE DAMAGES

296.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

297.    Lord's Ranch Defendants knew its staff presented an unreasonably high risk of sexual abuse to Plaintiffs.  As described with particularity herein, Defendants and its agents knew about the abuse Plaintiffs suffered at the hands of Emmett Presley, and they consciously made the decision not to act.  Defendants knew that their systematic refusal to take any steps whatsoever to protect Plaintiffs would certainly result in the continued sexual abuse of Plaintiffs and the other residents.  But the Lord's Ranch Defendants, including Ted Suhl and Shirley Suhl, did not just fail to act to prevent further abuses by Presley, they also made the calculated decision to allow Presley to continue to sexually abuse these boys, and they achieved this through threats, intimidation, and violence; the Suhl family and their underlings were nothing short of ruthless in their efforts to protect Presley and his habitual sexual abuse of the teenage boys in their care.

Therefore, Defendants' conduct can only be described as willful and wanton, and in reckless disregard of the consequences. The Lord's Ranch Defendants displayed a conscious indifference to the rights, safety, and welfare of Plaintiffs, and they should be punished to the fullest extent possible under the law.

298.    The Lord's Ranch Defendants betrayed the trust of Plaintiffs and the community in the most egregious manner, given the evidence of the danger posed by its staff, and Presley in particular, that it systematically ignored for an unreasonably long period of time. The Lord's Ranch Defendants' conduct was extreme, outrageous, and utterly intolerable in a civilized community. Its conduct went beyond all possible bounds of decency.

299.    Plaintiffs are seeking punitive damages to punish these Defendants, and to deter similar facilities and individuals from engaging in this depraved conduct.

## JURY DEMAND

300.    Plaintiffs respectfully demand a trial by jury as to all matters so triable, pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## RESERVATION OF ADDITIONAL CLAIMS

301.    Plaintiffs reserve the right to plead further upon completion of discovery to state additional claims and to name additional parties to this action.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs, by and through their undersigned attorneys, respectfully requests that a verdict or judgment is entered in their favor on all counts alleged, and against each and every named Defendant, separately and severally, and that damages are awarded to them in an amount which will adequately compensate Plaintiffs for the severe and permanent injuries and damages they sustained due to the Defendants' wrongful conduct, as well as award

punitive damages against Defendants in order to punish their horrific misconduct and to deter

future misconduct and abuse of children. Plaintiffs are seeking recovery for:

     a.  All available compensatory damages for the described losses with respect to each cause of action;

     b.  past and future medical expenses, as well as the costs associated with past and future life care;

     c.  past and future lost wages and loss of earning capacity;

     d.  past and future emotional distress;

     e.  consequential and/or special damages;

     f.  all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

     g.  disgorgement of profits obtained through unjust enrichment;

     h.  restitution;

     i.  punitive damages with respect to each cause of action;

     j.  attorneys' fees and case costs, including fees and costs recoverable pursuant to 42 U.S.C. § 1988(b) and pursuant to A.C.A. § 16-118-107;

     k.  pre- and post-judgment interest and all other interest recoverable; and

     l.  all other damages and compensation available and recoverable under state and federal law, and for any further relief this Court deems equitable and just.

Dated: January 9, 2024

Respectfully Submitted,

By: ___*/s/ Joshua Gillispie*_____
         Joshua D. Gillispie

Joshua D. Gillispie
**GILLISPIE LAW FIRM**
1 Riverfront Place, Suite 605

North Little Rock, AR 72114
(501) 244-0700
(501) 244-2020 fax
josh@gillispielawfirm.com

Martin D. Gould
Valerie A. Letko
**ROMANUCCI & BLANDIN, LLC**
321 N. Clark Street, Suite 900
Chicago, Illinois 60654
T: (312) 458-1000
F: (312) 458-1004
mgould@rblaw.net
vletko@rblaw.net


*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS,
### NORTHERN DIVISION

JOHN DOES 9 - 16,

            Plaintiffs,

v.

EMMETT A. PRESLEY; THEODORE E. SUHL,
individually and d/b/a MAXUS, INC. d/b/a
ARKANSAS COUNSELING ASSOCIATES
INCORPORATED d/b/a TRINITY
BEHAVIORAL HEALTHCARE SYSTEMS,
INC. d/b/a THE LORD'S RANCH; MAXUS,
INC., individually and d/b/a THE LORD's
RANCH; TRINITY BEHAVIORAL HEALTH
CARE SYSTEM, INCORPORATED, individually
and d/b/a THE LORD'S RANCH; THE LORD'S
RANCH CHRISTIAN BOY'S HOME, INC.; THE
LORD'S RANCH CHRISTIAN CENTER AND
CHILDREN'S REHABILITATION UNIT; THE
LORD'S RANCH  PSYCHIATRIC UNIT, INC.;
CHRISTIAN INTERNATIONAL MEDICAL
SCIENCES FOUNDATION, INC.;
CORNERSTONE TREATMENT CENTER, INC.;
BURKLYN CORPORATION; GOOD
SAMARITAN REHABILITATION CENTER,
INC.; WARM SPRINGS CHRISTIAN
CENTER, INC.; TRINITY DYNAMICS,
INCORPORATED; THE LORD'S RANCH
BEHAVIORAL HEALTHCARE SYSTEM,
INCORPORATED; TRIENNIA HEALTH CARE,
INC.; HORIZON SUNRISE MANAGEMENT;
MILLENIA HEALTH CARE, INC.; LG
PROPERTY MANAGEMENT,
INCORPORATED; GREEN VALLEY ASSET
MANAGEMENT, LLC; ROLLING HILLS
INVESTMENTS, LLC; REGAL PROPERTY
DEVELOPMENT LLC; SHIRLEY SUHL;
ALONZA JILES; and JOHN DOE
DEFENDANTS 1–10.

            Defendants.

Case No.:

Plaintiffs demand a jury trial





## AFFIDAVIT OF PLAINTIFFS' ATTORNEY
## PURSUANT TO ACA 16-56-125

COMES NOW AFFIANT, Joshua D. Gillispie, and hereby swears and affirms as follows to the best of his knowledge, information, and memory:

I hereby attest that Plaintiff is unaware of the identities of the John Doe Defendants 1-10. To the extent that such John Doe tortfeasor(s) are liable for some or all of Plaintiffs' damages, the identity of said tortfeasor(s) has not been determined as of this date and it is necessary to conduct discovery in order to determine the identity of said tortfeasor(s). If a John Doe Tortfeasor is identified for one or more causes of action, Plaintiff will amend this Complaint in accordance with Ark. Code Ann. 16-56-125.

_____           _____
SIGNATURE                          PRINTED NAME

_____
DATE

### ACKNOWLEDGMENT

On this day, personally appeared before me Joshua D. Gillispie, known to me to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained. WITNESS my hand and official seal, this 9th day of January, 2024.

_____
NOTARY PUBLIC

MY COMMISSION EXPIRES:

_____

